IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WM MOBILE BAY ENVIRONMENTAL CENTER, INC., ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CIVIL ACTION NO. 18-00429-KD-MU |
| THE CITY OF MOBILE and THE CITY OF MOBILE SOLID WASTE DISPOSAL AUTHORITY, ) ) ) ) ) | |
| Defendants. ) | |

## ORDER

This action is before the Court on the Motion for Summary Judgment filed by Defendant the City of Mobile, Plaintiff WM Mobile Bay Environmental Center, Inc.'s response, and the City's reply (docs. 117, 118, 126, 136, 147). The motion was heard on February 18, 2020. Upon consideration, and for the reasons set forth herein, summary judgment is granted in favor of the City as to Counts III and IV.

**I. Findings of Fact**

Initially, the City of Mobile owned and operated the Chastang Landfill and Bates Field Landfill for disposal of municipal solid waste. The City disposed of construction and demolition waste and yard waste at the Bates Field Landfill. The City disposed of other municipal solid waste at the Chastang Landfill. In 1985, as provided by the Code of Alabama, and City of Mobile Resolution No. 60-194, the City created the City of Mobile Solid Waste Disposal Authority to address the City's long-range requirements for municipal solid waste disposal. (Doc. 61-1).

In January 1993, by Ordinance No. 65-002, the City transferred, conveyed and assigned all of the City's rights, title, and interest to the existing landfills, equipment, and the municipal solid waste stream to the Authority. (Doc. 116-32). Specifically, as to solid waste, the City transferred and assigned to the Authority "the city solid waste stream, which includes all solid waste currently generated in the City and disposed of at the City landfill sites, and all future solid waste of a similar nature." (Id.). The City did not define solid waste, but in the recitals referenced solid waste as that "generated in private households, office buildings, commercial retail trade establishments, and retail service facilities in the City; . . ." (Id.).

In the Ordinance, the City explained that the purpose of establishing the Authority was to address the "need for long range planning to ensure the adequacy of disposal sites to meet the future needs of the City to dispose of solid waste in a cost efficient manner". (Id.). The City also empowered the Authority "to enter long term agreements with private companies to operate landfills, issue bonds to secure financing for the development of landfills, and to undertake other actions necessary to ensure adequate facilities for the future solid waste disposal need of the city." (Id.).

In October 1993, the Authority entered into a Solid Waste Management Contract with TransAmerican Waste Industries, Inc. (TWI) (Doc. 1-1). The contract provided that TWI would manage and operate the solid waste disposal facility owned by the Authority and located at the Chastang Landfill.

On March 29, 1994, the City and the Authority entered into an agreement for disposal of solid waste. In the recitals, the parties acknowledged that the City had conveyed its right to the "existing City landfills [Chastang and Bates Field]… and the Solid Waste stream now and in the future generated by the City and its citizens" to the Authority. (Doc. 61-2) (bracketed text

added).  The 1994 agreement also provides as follows: "The City hereby designates the Chastang Sanitary Landfill as the sole deposit point of all non-hazardous and non-infectious municipal solid waste collected by the City." (Doc. 61-2)

The stated beneficiaries of the 1994 agreement were the citizens of Mobile: "[T]he City has determined that it is in the best interest of the citizens of the City to contract with the Authority to ensure that the City meets its long term need for a landfill to dispose of its solid waste at a reasonable price" and that the "Legislature of the State of Alabama has authorized the City to enter into long term contracts with their Authorities[.]" (Id.).

 Under the "Additional Terms in Contract …", the City was "advised that the Authority has entered a management contract with TransAmerica Waste Industries, Inc." which required a royalty payment to the Authority.  (Id., p. 5).  The Authority agreed to "pay over to the City all royalty payments received from" TWI. (Id.)

In July 1995, with knowledge that the airport would build new runways near the Bates Field Landfill, the City issued a Request for Proposals to provide a different facility for disposal of the City's "household yard waste and construction/demolition waste." (Doc. 117, p. 3, n.2). TWI submitted a proposal for providing a construction and demolition waste facility (Doc. 118-11). TWI proposed a different landfill from the Chastang Landfill, "TWI's Mobile C&D Landfill", for receipt of this wastes.  (Id., p. 7).  Ultimately, on December 1, 1997, the City entered into an agreement with Gulf Hauling and Construction, Inc. for receipt of this waste (Doc. 117, p. 9).  At present, this waste is deposited at Dirt, Inc. landfill. (Doc. 136, p. 11).

In 1999, Chastang Landfill, Inc. was incorporated as a subsidiary of TWI. (Doc. 116-5). On December 17, 2002, TWI executed an Asset Contribution Agreement with Chastang Landfill

Inc. (Doc. 118-2).[1]  The parties agreed as follows: "Transamerican hereby grants, sells, transfers, conveys, assigns and delivers to Chastang, its successors and assigns, to have and to hold forever, all of Seller's right, title and interest in and to those assets and properties listed on Exhibit A" (Doc. 118-2).  Exhibit A listed the "Chastang Landfill further described as Business Unit 1143" (Id).

Chastang Landfill, Inc. changed its name to WM Mobile Bay Environmental Center, Inc. in 2008. (Doc. 120, p. 5).   Since 2002, Chastang Landfill, Inc., and now WM Mobile, have operated and managed the Chastang Landfill pursuant to the terms of the 1993 operation and management contract with the Authority.

In 2013, WM Mobile filed suit against the Authority in this Court. Among many claims, but relevant to this motion, WM Mobile claimed that the Authority had breached the 1993 contract by diverting construction and demolition waste, yard waste, and other waste to a different facility. (Civil Action No. 13-00434-KD-N).   In the 1993 contract, the Authority agreed to "have delivered all Mobile Solid Waste Stream only to the [Chastang Landfill] or the Transfer Station and to no other sites, for disposal by" TWI. (Doc. 116-4, p. 15). The Authority agreed "to dispose at the New Landfill [the Chastang Landfill] all the City of Mobile Solid Waste generated within the Service Area." (Id., p. 22).  "Mobile Solid Waste" is defined in the 1993 contract as "[a]ll non-infectious industrial, commercial, residential or municipal or other Solid Waste that is generated within the Service Area" excluding hazardous waste or waste that could not by law be deposited. (Id., p. 3).  "Solid Waste" is defined as "[a]ll Refuse and Demolition Waste." (Id., p. 2, 4).  "Demolition Waste" is defined as "[a]ll debris and waste

---

[1] Effective January 3, 2003, TWI merged into Waste Management Holdings, Inc.  (Doc. 116-5, p. 3; Doc. 116-8)

construction materials, including earth, rock, concrete, brick, plaster, plasterboard, glass, asphaltic concrete, plastics, wire, and other ferrous materials derived from the construction of or the partial or total demolition of buildings, roads, or other structures …" (Id., p. 2-3).  "Refuse" is defined as "cuttings from trees, lawns, and gardens" (Id., p. 4).  WM Mobile obtained a judgment in its favor against the Authority as to this claim and the judgment was affirmed on appeal.

In 2017, the City and WM Mobile entered into a Settlement Agreement and Release. (Doc. 61-6).  The parties settled "any and all claims that could be brought by WM Mobile Bay against the City as a result of the City's deposit of Municipal Solid Waste at disposal facilities other than the Chastang Landfill after the Effective Date." (Doc. 61-6, p. 2).  The parties recognized that the City and the Authority were parties to the 1994 agreement wherein the "City designated the Chastang Landfill as the sole deposit point for all Municipal Solid Waste (including Diverted Waste) collected by the City." (Id.)  The City denied "any wrongdoing, breach, or liability" for diverting wastes to another landfill. (Id., p. 2, 5).

The Settlement Agreement defined "Diverted Waste" as "Yard Waste, Construction and Demolition Waste, and White Goods collected by the City" and defined "Municipal Solid Waste" as "all non-infectious, industrial, commercial, diverted waste, residential and municipal or other solid waste that is collected within the city limits[.]" (Id., p. 3).  The City agreed to pay WM Mobile a set sum for lost profits for the "Diverted Waste" sent to a different landfill between October 1, 2016 and July 31, 2017, and to pay a set sum for "reimbursement of capital improvement" at the Chastang Landfill. (Id.)  The City also agreed to pay a monthly payment to WM Mobile for each "cubic yard of Diverted Waste deposited at disposal facilities other than the Chastang Landfill after July 31, 2017." (Id.)  The City paid the two initial set sum payments and

two monthly payments. The City has not paid any further monthly payments because the City Council has not approved the funding needed to make the payments. The City continues to divert wastes to a different landfill.

## II. Statement of the Law

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Williamson v. Brevard County, 928 F.3d 1296, 1304 (11th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). "The movant bears the burden of presenting pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." Id. (citing Procaps S.A. v. Patheon, Inc., 845 F.3d 1072, 1079 (11th Cir. 2016) (citations and quotations omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).

The district courts are "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013) (citation omitted). In reviewing cross-motions for summary judgment, the court should "draw all inferences and review all evidence in the light most favorable to the non-moving party." Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1239–40 (11th Cir. 2018) (citation omitted).

## III. Breach of Contact (Third Party Beneficiary)

6

WM Mobile alleges that it is an intended direct third-party beneficiary to the 1994 agreement because the agreement "designates the Chastang Sanitary Landfill as the sole deposit point of all non-hazardous and non-infectious municipal solid waste collected by the City." (Doc. 61, p. 8). WM Mobile claims that the City breached the 1994 agreement by directing yard wastes or construction and demolition waste to a separate facility, and deprived WM Mobile of the profits from disposal of this waste at the Chastang Landfill.

"Under Alabama law,[2] 'a third person has no rights under a contract between others unless the contracting parties intend that the third person receive a direct benefit enforceable in court as opposed to an incidental benefit.'" Brown v. Gadsden Regional Med. Ctr. LLC, 748 Fed. Appx. 930, 933 (11th Cir. 2018) (citing Fed. Mogul Corp. v. Universal Constr. Co., 376 So.2d 716, 723-24 (Ala. Civ. App. 1979) (emphasis omitted)). The party claiming status as a third party beneficiary "must establish '(1) that the contracting parties intended, when they entered the contract, to bestow a direct, as opposed to an incidental, benefit upon a third party, (2) that the plaintiff was the intended third-party beneficiary of the contract, and (3) that the contract was breached.'" Catlin Syndicated Ltd. v. Ramuji, LLC, 2018 WL 6303776, at *3 (N.D. Ala. Nov. 29, 2018) (quoting Aliant Bank, a Div. of USAmeribank v. Four Star Investments, Inc., 244 So. 3d 896, 934 (Ala. 2017)).

In Beverly v. Macy, 702 F.2d 931(11th Cir. 1983), the Court summarized Alabama law regarding third party beneficiary status:

---

[2] This action is before the Court on basis of diversity jurisdiction. Therefore, the Court applies the substantive law of the forum state, Alabama. See Stinson v. Twin Pines Coal Co., Inc., 2014 WL 472605, at *4 (M.D. Ala. 2014) ("In this diversity, breach-of-contract action, the standing analysis converges under Article III and state law because '[t]he question of whether, for [Article III] standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law.'").

> It is well-established that the parties to a contract may create rights in a third-party beneficiary by manifesting an intention to do so. "The crucial inquiry involves a determination of intent, and third parties may sue on the contract only if it may be said to have been intended for their direct, as opposed to incidental, benefit." …. [T]he key inquiry is whether the claimant was intended to be benefited by the contract provision in question….Further, "[i]t is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." Restatement (Second) of Contracts § 308…. Finally, when determining whether the parties to the contract intended to bestow a benefit on a third party, a court may look beyond the contract to the circumstances surrounding its formation.

Id. at 940 (citations omitted); see also Cincinnati Ins. Companies v. Barber Insulation, Inc., 946 So. 2d 441, 443 (Ala. 2006) ("A party claiming to be a third -party beneficiary, 'must establish that the contracting parties intended, upon execution of the contract, to bestow a *direct,* as opposed to an *incidental,* benefit upon the third party."(citations omitted)).

"To determine the contracting parties' intent to confer a direct benefit on a third party, the court must first look to the contract itself, because, while the intention of the parties controls in construing a written contract, the intention of the parties is to be derived from the contract itself, where the language is plain and unambiguous." H.R.H. Metals, Inc. v. Miller ex rel. Miller, 833 So. 2d 18, 24 (Ala. 2002) (alteration and quotation marks omitted).

**Successor-in-interest**

The City argues that WM Mobile is not the successor-in-interest to any purported third-party beneficiary rights of TWI because there was not a valid assignment of any contractual rights. The City points out that the Asset Contribution Agreement indicates only the sale of an asset, the "Chastang Landfill further described as Business Unit 1143"and does not reference any contractual rights, which is required under Alabama law.

As a matter of contract interpretation, the Court first looks to the face of the document to determine any transfer of third-party benefit rights. Brown, 748 Fed. Appx. at 933 ("When the language of the contract is plain and unambiguous, we look only to the contract itself to determine the intent of the contracting parties."). The document is captioned "Asset Contribution Agreement and Bill of Sale and Agreement Regarding Assumption of Liabilities" (Doc. 118-2). In relevant part, the parties agreed forth as follows:

> *Section 1. Contribution and Sale by Transamerican*. Transamerican hereby grants, sells, transfers, conveys, assigns and delivers to Chastang, its successors and assigns, to have and to hold forever, all of Seller's right, title and interest in and to those assets and properties listed on Exhibit A hereto (collectively, the "Assets"). Such Assets are transferred and conveyed by Transamerican to Chastang as a capital contribution. Chastang hereby accepts and takes delivery of the Assets and accepts Transamerican's capital contribution in connection therewith.
>
> *Section 2. Assumption of Liabilities by Chastang*. In consideration of the Assets acquired by Chastang hereunder, Chastang hereby accepts, assumes and agrees to fully perform all of Transamerican's obligations pursuant to and in connection with the Assets.

(Doc. 118-2, p. 1). Exhibit A listed "Chastang Landfill further described as Business Unit 1143" (Id., p. 3).

TWI sold, transferred, conveyed and assigned to Chastang Landfill, Inc.[3], "all" of its "right, title and interest" in Chastang Landfill. TWI's "interest" in the Chastang Landfill/Business Unit 1143 was based on the 1993 contract to operate and manage the Landfill. Although the 1993 contract was not specifically assigned, TWI's "right, title, and interest" in the

---

[3] The parties do not dispute that WM Mobile is the successor to Chastang Landfill, Inc.

Chastang Landfill was assigned. The only rights or interests that TWI had in the Chastang Landfill arise from the 1993 contract.[4]

The City cites to Clark Substations, LLC v. Ware, 838 So. 2d 360, 365 (Ala. 2002)[5] for its recognition that in a sale-of-assets transaction, Alabama law requires more than the "mere purchase" of assets. The issue in Clark Substations was whether an employee's non-compete agreement was assigned in an asset purchase agreement. The Court held that the non-compete agreement was not part of the assets purchased because there is a "policy disfavoring noncompetition agreements," the non-compete agreement contained a non-assignability clause and the non-compete was not listed as an asset in the asset purchase agreement. Id. From this holding the City argues that the 1993 contract had to be specifically referenced in order to have a valid assignment. The Court disagrees. The Asset Contribution Agreement at issue contains more than the "mere purchase" of unidentifiable assets. It specifically gave WM Mobile all interest held by TWI in the Chastang Landfill. And as stated, TWI's "interest" in the Chastang Landfill stems solely from the 1993 operating agreement with the Authority. Therefore, the Court finds that WM Mobile is the successor to TWI's rights, title and interests in the 1993 operating agreement.

---

[4] The City pointed to the deposition of two corporate representatives who testified that they were not aware of any assignment of the 1993 contract from TWI to Chastang Landfill, Inc. as evidence that the contract was not assigned. However, what these representatives know about the assignment does not change the plain language of the Asset Contribution Agreement.

[5] In Clark Substations, the Alabama Supreme Court held that Clark Substations "is not a successor entitled to enforce the noncompetition agreements executed by Ware and Edwards in the course of their employment by Clark Corporation" because the noncompetition agreements were not assignable. 838 So. 2d at 365.

**Third Party Beneficiary status**

The City argues that the 1994 agreement is unambiguous and there is no evidence therein that the parties intended to confer a direct benefit upon TWI. The City concludes that since TWI was not an intended third-party beneficiary to the 1994 agreement, no third-party rights could have been assigned or conveyed to WM Mobile.

WM Mobile responds that, as the successor of TWI, it is a direct, intended third party beneficiary because the 1994 agreement anticipates a specific necessary third party – the landfill operator. WM Mobile points out that the 1994 agreement refers to TWI by name and acknowledges the 1993 contract for operation and management of the Chastang Landfill.[6] WM Mobile also argues that Ordinance 65-002 which created the Authority, was enacted for the purpose of allowing the Authority to enter into long term agreements with private companies for waste disposal. Thus, because WM Mobile's predecessor (TWI) was a known and necessary third-party for the 1994 agreement, WM Mobile is a third-party beneficiary to the 1994 agreement.

There is no dispute that the City knew when it entered into the 1994 Agreement with the Authority that depositing all of the municipal solid waste at the Chastang landfill might benefit TWI since TWI's compensation for operating the landfill was tied to the amount of waste it received. But, "'[f]oreseeability [alone], however, does not confer [third-party] beneficiary

---

[6] Under the "Additional Terms in Contract …", the City was "advised that the Authority has entered a management contract with TransAmerica Waste Industries, Inc." which required a royalty payment to the Authority. (Doc. 61-2, p. 5). The Authority agreed to "pay over to the City all royalty payments received from" TWI. (Id.)

status.'" Harris Moran Seed Co. v. Phillips, 949 So. 2d 916, 923 (Ala. Civ. App. 2006) (quoting In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 21 F. Supp. 2d 593, 600 (E.D. La. 1998)).  Instead, WM Mobile must prove that the City intended to bestow a direct benefit on TWI/WM Mobile.

Prior to the March 1994 agreement between the City and the Authority, the City passed a January 26, 1993 Ordinance which authorized the transfer of the City's interest in the landfill sites, personal property and solid waste to the Authority. (Doc. 116-32). As to solid waste, Ordinance No. 65-002 provided that the "City hereby transfers and assigns to the Authority the City solid waste stream, which includes all solid waste currently generated in the City and disposed of at the City landfill sites, and all future solid waste of a similar nature." (Doc. 116-32, p. 2)

The October 6, 1993 contract, between the Authority and WM Mobile's predecessor (TWI) regarding the disposal of solid waste, provided that "the Authority agrees to have delivered all Mobile Solid Waste Stream only to the Landfill [defined as the Chastang Landfill] or the Transfer Station and to no other sites, for disposal by contractor." (Doc. 116-4, p. 15). As explained *supra*, when the Authority entered into the October 6, 1993 contract, the City had already given the Authority control and title to the City's solid waste stream (that the City currently delivered to city landfills and future waste of a similar nature). The October 6, 1993 contract also required the Authority to pay certain fees to TWI to compensate for the operation of the Chastang Landfill.

The stated purpose of the 1994 agreement between the Authority and the City was to benefit the citizens of Mobile by providing a long-range plan for meeting the City's "needs for a landfill to dispose of its solid waste at a reasonable price." (Doc. 116-18 p. 2) The 1994

agreement: 1) designated the Chastang Landfill as the sole deposit point of all non-hazardous and non-infectious municipal solid waste collected by the City; 2) acknowledged that the Authority was obligated to receive all of said solid waste, 3) set the rates and fees the city would pay to the Authority for acceptance of the solid waste, and (4) obligated the Authority to remit to the City all royalty payments received from TWI. (Id.)   Thus, the purpose of the 1994 Agreement was to designate **where** the solid waste (that was now titled to the Authority via the Ordinance) would be deposited and to establish the financial arrangement between the City and the Authority.

Upon review of the 1994 agreement and the surrounding circumstances, and with the benefit of oral argument, it is clear that any benefit bestowed on TWI pursuant to the 1994 Agreement was incidental, not an intended direct benefit to TWI.   This is seen most clearly by the City's statement in the 1994 Agreement that it intended the beneficiary to be the citizens of Mobile.  And, there is no evidence, nor can it be implied from the 1993 contract or the surrounding circumstances, that the City intended to bestow any <u>direct</u> benefit on the operator of the Chastang Landfill.   The City expressed no preference as to who operated the landfill or even how it would be operated.  The sole purpose of the 1994 agreement was to empower the Authority to provide for the disposal of solid waste in a cost-efficient manner for the benefit of the citizens of Mobile.  TWI/WM Mobile was merely an incidental beneficiary to this arrangement.

Moreover, the 1994 agreement provides that it is effective for at least 20 years.  Thus, any third-party benefits would be for at least 20 years.  As the City points out, it is prohibited by law from entering into a contract for services that exceeds three years.[7]  Ala. Code § 41-16-57(f)

---

[7] The agreement with the Authority is specifically exempted from this prohibition.  See, Ala. Code § 11-89A-18

("Contracts for the purchase of personal property or contractual services shall be let for periods not greater than three years.")  Thus, it is implausible to say that the City intended to be contractually bound to TWI for at least twenty years (through the 1994 agreement) when it was prohibited by law from doing so.

WM Mobile relies heavily on <u>Beverly v. Macy</u>, for its assertion of third party beneficiary status.   In <u>Beverly</u>, the court held that Beverly was a third-party beneficiary to a service contract between the Hartford Insurance Group and NFIA (National Flood Insurers Association).  702 F. 2d at 942-943. Beverly purchased a flood insurance policy from the NFIA. Under an agreement between NFIA and Hartford, Hartford was responsible for servicing Beverly's policy, including sending premium notices.  At some point Hartford neglected to send a premium notice, the policy lapsed and Beverly did not have coverage when a hurricane damaged the previously insured property.  The Court held that Beverly's reliance on receiving premium notices and the "significant" fact "that the NFIA was created for the sole purpose of participating in a government program designed to provide the fullest possible flood insurance protection to the public" dictated that Beverly was an intended beneficiary of the NFIA-Hartford agreement.  Id. at 942.

The facts of <u>Beverly</u> are clearly distinguishable.  First, the Court found that the contract in <u>Beverly</u> **imposed a duty** on Hartford to send premiums notices to all policyholders which included Beverly.  The 1994 Agreement between the City and the Authority did not impose a duty on the City (or the Authority) with regard to WM Mobile.   Next, NFIA, like the Authority, was created to aid the government in servicing the public.   Existing policyholders like Beverly were the intended recipients of the benefits to be provided by NFIA.  Thus, when NFIA contracted with Hartford to service Beverly's policy, Beverly was clearly an intended

14

beneficiary. The Authority was not created so that it could benefit operators of Chastang Landfill, but rather to benefit the citizens of Mobile.

Upon consideration the Court finds that WM Mobile has no cause of action against the City pursuant to the 1994 agreement.

**Waiver of third-party rights in 1994 Agreement**

Even if WM Mobile was an intended direct third-party beneficiary under the 1994 agreement, it has waived any right to claim that status.

The City points to two facts that support its waiver argument. First, the City highlights that TWI submitted a proposal in 1995 to receive construction and demolition waste and yard waste at a different landfill from the Chastang Landfill. From this the City argues that TWI acted inconsistently with the alleged right to receive such waste under the 1994 agreement. Second, the City asserts waiver because WM Mobile, with knowledge that these wastes were not deposited at Chastang Landfill, waited more than 20 years after the 1994 agreement to enforce its purported third-party beneficiary rights to have the City deliver such waste to the Chastang Landfill.

WM Mobile asserts that this Court previously "dispensed with the suggestion" that the 1995 proposal undermined WM Mobile's right to have construction and demolition waste and yard waste delivered to the Chastang Landfill. (Doc. 136, pp. 3, 12). This assertion is incorrect as the Court has never considered the issue of waiver as it relates to either the 1993 contract or the 1994 agreement.

Previously, when addressing WM Mobile's claim for breach of contract relating to exclusive disposal rights, the Authority argued that the course of dealing, specifically the submission of the 1995 proposal, indicated that the parties did not intend for WM Mobile to have

15

exclusive disposal rights (Doc. 116-1, p. 30, Order on Summary Judgment, Civil Action No. 13-00434-KD).  The Court determined that it need only consider the parties' intentions or the course of dealing when the terms are ambiguous.  Since the 1993 contract is not ambiguous as to delivery of "all Mobile Solid Waste Stream only to the [Chastang] Landfill", the Court did not consider the parties' course of dealing in determining the meaning of the term solid waste. (Id., p. 30-31).  The issue of whether WM Mobile **waived** any right to assert breach of contract to the 1993 contract between the Authority and WM Mobile or as a third party beneficiary to the 1994 agreement between the City and the Authority was not raised or addressed.

> As explained by a sister court,
>
> "[w]aiver is the intentional relinquishment of a known right.... Intentional relinquishment must be shown in an unequivocal manner. A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right." Edwards v. Allied Home Mortg. Capital Corp., 962 So.2d 194, 208-09 (Ala. 2007) (citations omitted). That is, "it is well established that a party's intention to waive a right is to be ascertained from the external acts manifesting the waiver.... This intention to waive a right may be found where one's course of conduct indicates the same or is inconsistent with any other intention." Hughes v. Mitchell Co., 49 So.3d 192, 201-02 (Ala. 2010) (citations omitted). Furthermore, the party asserting waiver must have "been induced by such conduct to act upon the belief that there has been a waiver and has incurred trouble or expense thereby." Alabama State Docks v. Saxon, 631 So.2d 943, 946 (Ala. 1994). "Whether a party has intentionally waived a known right is normally a jury question." Edwards, 962 So.2d at 209.

Madison Cty. v. Evanston Ins. Co., 340 F. Supp. 3d 1232, 1279 (N.D. Ala. 2018), *as amended* (Nov. 2, 2018).

WM Mobile argues that it has not waived the right to have yard waste and construction and demolition waste delivered exclusively to Chastang Landfill.  (Doc. 136, p. 20, n. 5).  WM Mobile relies on the fact that it began to assert <u>against the Authority</u> the alleged right to have all yard waste and construction and demolition waste collected by the City delivered to the Chastang Landfill as early as 2001 and has been litigating based on that right since 2013.

16

From the asserted uncontested facts, it appears that between 1993-1997, yard waste and construction and demolition waste was processed at Bates Field Landfill. And during this time, TWI submitted three proposals in 1995 to have the waste delivered to a new landfill TWI had acquired in 1994. (Doc. 117, p. 8). The proposals were submitted in response to the City's request for a proposal to provide a Construction and Demolition landfill. Thus, rather than assert its asserted right to have the said waste delivered by the City to the Chastang Landfill, WM Mobile (TWI) proposed a new facility to receive said waste. In 1997 the City entered into an agreement with another entity to receive the yard waste and construction and demolition waste and thereafter the said waste was delivered to this entity. TWI did nothing in response to assert its alleged rights against the City. In the meantime, the party asserting waiver, the City, "incurred trouble and expense" in its quest to find a disposal site for the yard waste and construction and demolition waste. It was not until 2013 that any formal action was taken. And even then, no formal action was taken against the City until 2018 by WM Mobile as the purported third party beneficiary of the 1994 Agreement between the City and the Authority. Accordingly, as to the City, the Court finds that WM Mobile has waived any alleged third party beneficiary rights under the 1994 Agreement between the City and the Authority.

Because WM Mobile is not an intended direct beneficiary under the 1994 agreement, and even if it was, it has waived such rights, summary judgment is GRANTED to the City on the claim that the City breached the 1994 agreement.

### IV. Count IV Breach of Settlement Agreement

WM Mobile states that in 2017, it entered into a settlement agreement with the City wherein the City acknowledged that the 1994 agreement designated the Chastang Landfill as the

17

" 'sole deposit point' of all non-hazardous and non-infectious Municipal Solid Waste collected by the City" and agreed to pay WM Mobile $2.40 per cubic yard each month for "Municipal Solid Waste diverted to any disposal facilities other than the Chastang Landfill." (Doc. 61, p. 9). WM Mobile alleges that the City "breached its contractual obligations by continuing to divert certain Municipal Solid Waste to disposal facilities other than the Chastang Landfill without paying the monthly payments as required by the Settlement Agreement." (Id.)

The City argues that it is entitled to summary judgment because the 2017 settlement agreement is null, void and unenforceable pursuant to Ala. Code § 11-44C-67 and Mobile Municipal Code Section 2-66(j).[8] In relevant part, Section 11-44C-67, sets forth as follows:

> No officer, department, or agency shall, during any budget year, expend or contract to expend any money or incur any liability, for any purpose in excess of the amounts appropriated for that general classification of expenditure pursuant to this chapter. Any contract, verbal or written, made in violation of this chapter shall be null and void.

Ala. Code § 11-44C-67.  And in 2017 the Mobile Municipal Code Section 2-66(j) provided that "[a]ll contracts requiring budget amendments for funding must come before the council in order to appropriate funds."  (Doc. 118-25).

WM Mobile does not contest that in order for the monthly payments to be funded a budget amendment is required.  Moreover, WM Mobile has not rebutted the evidence that the payments required by the settlement agreement are in excess of the amounts appropriated for that general classification of expenditure. (Doc. 118-14).  Also, WM Mobile cites to no authority that the City's interpretation of Ala. Code §11-44C-67 is incorrect.   Rather WM Mobile makes a

---

[8]  The settlement agreement provides that it "shall be governed and construed in accordance with the laws of the State of Alabama without giving effect to any rules governing conflict of law." (Doc. 61-6, p. 5).

18

fairness argument that the statute unfairly gives the City "cart blanche" to disregard the settlement agreement and asserts that the City should be bound by the Mayor's signature. WM Mobile may be correct, but this Court has no authority to overrule the Alabama legislature's policy determination on this point. Accordingly, the Court finds that pursuant to Ala. Code § 11-44C-67, the 2017 settlement agreement is unenforceable.[9]

V. **Conclusion**

Viewing the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, WM Mobile, and for the reasons set forth herein, summary judgment is granted in favor of the City as to Counts III and IV.

DONE and ORDERED this 21st day of February 2020.

> s/ Kristi K. DuBose
> KRISTI K. DuBOSE
> CHIEF UNITED STATES DISTRICT JUDGE

---

[9] At oral argument, the City explained the circumstances surrounding the execution of the 2017 settlement agreement, the initial payments to WM Mobile, and the subsequent absence of an appropriation by the Council to make the monthly payments. In sum, when the Mayor signed the settlement agreement, he apparently did so with the understanding that legal counsel for the City Council would recommend that the Council fund the settlement because it was in the best interest of the City to do so. Thereafter, new legal counsel was hired by the City Council which resulted in unanticipated opposition to funding the settlement agreement.