# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| WM MOBILE BAY ENVIRONMENTAL CENTER, INC.,      ) ) ) | |
|     **Plaintiff,**      ) ) | |
| **v.**      ) ) | CIVIL ACTION NO. 18-00429-KD-MU |
| THE CITY OF MOBILE and THE CITY OF MOBILE SOLID WASTE DISPOSAL AUTHORITY,      ) ) ) ) | |
|     **Defendants.**      ) | |

## ORDER

This action is before the Court on the motion for summary judgment filed by Defendant The Solid Waste Disposal Authority of the City of Mobile (the Authority) and evidence in support, Plaintiff WM Mobile Bay Environmental Center, Inc.'s (WM Mobile) response and evidence in support, and the Authority's reply and evidence in support (docs. 115, 124, 134, 148); and the motion for summary judgment filed by Plaintiff WM Mobile and evidence in support, the Authority's response and evidence in support, and WM Mobile's reply (docs. 116, 119, 120, 128, 129, 152).[1]

WM Mobile has filed suit, for the second time, alleging that the Authority has breached the October 6, 1993 Contract with WM Mobile by failing to dispose of all of the City of Mobile' solid waste at the Chastang Landfill and by failing to reimburse WM Mobile for certain capital expenses and operational costs

---

[1]  The Court granted the City of Mobile's motion for summary judgment as to Counts III and IV. (Doc. 167).  Therefore, the Court will only address the remaining parties' arguments as to Counts I and II.

Upon consideration, and for the reasons set forth herein, summary judgment is GRANTED in part and DENIED in part.

## I. **Findings of Fact**

Initially, the City of Mobile owned and operated the Chastang Landfill and Bates Field Landfill for disposal of municipal solid waste.  The City disposed of construction and demolition waste and yard waste at the Bates Field Landfill.  The City disposed of other municipal solid waste at the Chastang Landfill.  In 1985, as provided by the Code of Alabama, and City of Mobile Resolution No. 60-194, the City created the City of Mobile Solid Waste Disposal Authority to address the City's long-range requirements for municipal solid waste disposal. (Doc. 61-1).

In January 1993, by Ordinance No. 65-002, the City transferred, conveyed and assigned all of the City's rights, title, and interest to the existing landfills, equipment, and the municipal solid waste stream to the Authority. (Doc. 116-32).  Specifically, as to solid waste, the City transferred and assigned to the Authority "the city solid waste stream, which includes all solid waste currently generated in the City and disposed of at the City landfill sites, and all future solid waste of a similar nature." (Id.). The City did not define solid waste, but in the recitals referenced solid waste as that "generated in private households, office buildings, commercial retail trade establishments, and retail service facilities in the City; . . ." (Id.).

In October 1993, the Authority entered into a Solid Waste Management Contract with TransAmerican Waste Industries, Inc. (TWI) (Doc. 116-4).  The contract provided that TWI would manage and operate the solid waste disposal facility owned by the Authority and located at the Chastang Landfill.  Relevant to the motions, in Section 1.32, the Authority agreed "to have

delivered all Mobile Solid Waste Stream only to the [Chastang Landfill] or the Transfer Station and to no other sites, for disposal by" TWI. (Id., p. 15).  In Section 5.2, the Authority agreed "to dispose at the [the Chastang Landfill] of all the City of Mobile Solid Waste generated within the Service Area." (Doc. 116-4, p. 22).

"Mobile Solid Waste" is defined in the 1993 contract as "[a]ll non-infectious industrial, commercial, residential or municipal or other Solid Waste that is generated within the Service Area" excluding hazardous waste or waste that could not by law be deposited. (Doc. 116-4, p. 3). "Solid Waste" is defined as "[a]ll Refuse and Demolition Waste." (Id., p. 2, 4).  "Demolition Waste" is defined as "[a]ll debris and waste construction materials, including earth, rock, concrete, brick, plaster, plasterboard, glass, asphaltic concrete, plastics, wire, and other ferrous materials derived from the construction of or the partial or total demolition of buildings, roads, or other structures …" (Id., p. 2-3).  "Refuse" is defined as

> All Solid Waste, and commercial and industrial Special Waste meeting the classification of such terms as defined by ADEM or the State of Alabama, and including, with limitation: wastes such as discarded materials from dwelling places, households, apartment houses, stores, office buildings, restaurants, hotels, institutions, and all commercial and industrial establishments, including waste or discarded food, animal and vegetable matter, paper, cardboard, wood, cans, glass, ashes and boxes, cutting from trees, lawns and gardens, septic tank pumping and dried digested sludge grit.

(Id., p. 4).

With respect to compensation, Section 6.6 of the 1993 contract sets forth as follows:

> 6.6 <u>Price Adjustments.</u> The Contractor and the Authority recognize that during the life of this Contract many circumstances may arise which cannot be predicted or foreseen. It is the intent of this Section to set forth reasonable expectations as to the items which could produce these circumstances, and to provide a means of arriving at adjustments in Payments or compensation hereunder to Contractor to reflect the resulting cost impacts.
>
> Except as otherwise provided herein, the per ton fees payable to Contractor shall not be adjusted during the first two Contract Years. Each

Contract Year thereafter, such fees shall, at the request of Contractor, be adjusted to reflect the change in the cost of Contractor doing business hereunder in an amount to be mutually agreed upon by Contractor and the Authority, not to exceed the change in the Consumer Price Index, or the Competitive Price Index, whichever is the lowest.

Said negotiations may include, but not necessarily be limited to, the following situations:

(i) compensation to Contractor for the design and/or construction of on-site betterments;
(ii) material changes in tonnage delivered to the Landfill or the Transfer Station;
(iii) changes in labor and/or equipment requirements or rates;
(iv) unexpected cost changes by Contractor.

The adjusted proposal price resulting from said negotiations shall include compensation for all labor, equipment and materials necessary to perform this Contract as may be amended by said negotiations.

Notwithstanding any provision in this Contract to the contrary, the Authority shall reimburse Contractor for any increases in Contractor's costs due to laws, rules, regulations or ordinances that become effective or have different interpretations after the date this Contract is entered into and that have an adverse impact on Contractor hereunder. Furthermore, in the event that Contractor incurs any material increase in costs as a result of events which it could not reasonably foresee which arise after the date this Contract is entered into and which are beyond the reasonable control of the Contractor (including price increases, operating cost increases, reductions in revenue expectations, reduction in volume of the Mobile Waste Stream deposited at the Landfill below the represented figures in the RFP, equipment or repair costs or other similar items), such that either Contractor's purpose in entering into this Contract shall be frustrated or its performance hereunder or its financial expectations from this Contract would be adversely affected, there shall be an immediate equitable adjustment of the rates and/or other compensation ("Equitable Rate Adjustment") paid under this Contract by the Authority to the Contractor so as to compensate Contractor for such increased costs, in the manner as shall otherwise be provided herein.

The Authority shall reimburse the Contractor for any surcharge, fee, city, tax or other charges imposed by federal, state or local government or any agency thereof, for the purpose of funding solid waste management programs. Such items shall be cause for an automatic, and immediate rate adjustment in the amount of such fee, duty, tax or charge.

In addition to the above, either Contractor or the Authority shall be allowed to initiate actions and to agree to rate adjustments hereunder that would

result from the implementation of methods, processes or other technology for the benefit of the environment, the public and/or the community and that were not contemplated hereunder.

For such adjustments, Contractor shall petition the Authority prior to any such adjustment and shall be responsible for documenting, to the Authority's reasonable satisfaction, the cause for the adjustment and the Authority shall render a decision within 30 days after the Contractor has provided such documentation. Contractor shall give reasonable notice to Haulers of rate increases hereunder.

The cost of fines or penalties imposed for violations by Contractor of Permit conditions, laws or regulations shall not be considered as cause for a rate adjustment.

The Authority and the Contractor may, prior to the first day of October of each Contract year, negotiate adjustments in the Payment Rate and any other provision of the Contract.

(Doc. 116-4, p. 23-25).

WM Mobile bases its claims for reimbursement on this part of Section 6.6:

Notwithstanding any provision in this Contract to the contrary, the Authority shall reimburse Contractor for any increases in Contractor's costs due to laws, rules, regulations or ordinances that become effective or have different interpretations after the date this Contract is entered into and that have an adverse impact on Contractor hereunder.

(Doc. 134, p. 15).

Also relevant to these motions, Section 1.10 of the 1993 contract states follows:

1.10 Assignment. This Contract or any portion thereof may not be assigned by the Contractor without consent of the Authority, except that the Contractor may assign money due or which shall accrue to it under the Contract.

(Doc. 116-4, p. 7).

In August 1995, in anticipation of the closure of the City of Mobile's Bates Field

Landfill, TWI submitted a proposal to the City "to provide a duly permitted C&D facility for the

processing and disposal of Mobile's Municipal Household Yard Waste." (Doc. 115-29, p. 5).

TWI proposed a different landfill from the Chastang Landfill, "TWI's Mobile C&D Landfill",

for receipt of this wastes.  (Id., p. 7). Ultimately, on December 1, 1997, the City entered into an agreement with Gulf Hauling and Construction, Inc. for receipt of this waste (Doc. 117, p. 9).  At present, this waste is deposited at the Dirt, Inc. landfill. (Doc. 115, p. 24).

In 1999, Chastang Landfill, Inc. was incorporated as a subsidiary of TWI. (Doc. 116-5, 116-6). On December 17, 2002, TWI executed an Asset Contribution Agreement and Bill of Sale and Agreement regarding Assumption of Liabilities with Chastang Landfill Inc. (Doc. 116-7). The parties agreed as follows: "Transamerican hereby grants, sells, transfers, conveys, assigns and delivers to Chastang, its successors and assigns, to have and to hold forever, all of Seller's right, title and interest in and to those assets and properties listed on Exhibit A." (Doc. 116-7). Exhibit A listed the "Chastang Landfill further described as Business Unit 1143" (Id).

Also, on December 17, 2002, TWI merged into Waste Management Holdings, Inc. (WMH) (Doc. 115-20).  By Certificate of Correction, filed February 20, 2003, the merger was made effective January 3, 2003. (Doc. 116-8)

On December 18, 2002, WMH executed a Stock Contribution Agreement with Waste Away Group, Inc., a wholly owned subsidiary of WMH (Doc. 115-21). Waste Away owns, operates, and is headquartered at a waste transfer station in Theodore, Alabama (Doc. 115, p. 12).   WMH contributed all the stock of Chastang Landfill, Inc., to Waste Away.  On August 4, 2008, Chastang Landfill, Inc. changed its name to WM Mobile Bay Environmental Center, Inc. (Doc. 120, p. 5).  WM Mobile is a wholly-owned subsidiary of Waste Away, which in turn is a wholly-owned subsidiary of WMH, which is a wholly-owned subsidiary of Waste Management, Inc.  (Doc. 116-5, p. 3-4).

In 2003, the Authority leased the Chastang Landfill to Waste Away, the parent company of WM Mobile. (Doc. 10-1).  The lease was executed in connection with a bond issue for

improvements to the Chastang Landfill. In the recitals, the parties to the lease state that the

Chastang Landfill "is presently owned by the Issuer [the Authority] and the Company [Waste

Away] operates the Existing Facility pursuant to the terms of that certain Contract, dated October

6, 1993, by and between the Issuer and the Company, as successor in interest to TransAmerican

Waste Industries, Inc., as amended (the "Operating Agreement")" (Doc. 10-1, p. 5).  In Section

1.5, the parties agreed:

> Continuing Effect of Operating Agreement. The Company and the Issuer hereby
> acknowledge that the Operating Agreement continues to be in effect and that the
> Operating Agreement shall continue to be in effect after the date hereof until such
> time as the Operating Agreement is terminated in accordance with its terms. The
> Company and the Issuer hereby agree that, to the extent that the terms of this
> Agreement and the Operating Agreement conflict with respect to the operation of
> the Existing Facility by the Company or an affiliate thereof, the terms of the
> Operating Agreement shall control.

(Doc. 10-1, p. 7).

In 2013, WM Mobile filed suit against the Authority in this Court. Among many claims,

but relevant to this motion, WM Mobile claimed that the Authority had breached the 1993

contract, specifically Section 6.6, by failing to reimburse WM Mobile for capital expenditures

(Count III) and increased costs due to changes in laws and regulations (Count IV). (Doc 29,

Second Amended Complaint, Civil Action No. 13-00434-KD-N (S.D. Ala. 2013)).

On WM Mobile's motion for summary judgment, the Court found that the parties did not

"dispute the validity" of the 1993 contract or Section 6.6. (Id., Doc. 125, p. 13). The Court found,

however, that there were issues of fact as to these claims and summary judgment was denied.

(Id., Doc. 125, p. 14).  Specifically,

> Upon consideration of the factual allegations regarding the requests for price
> adjustments and reimbursements from September 2010 through August 2013 and
> the documentation provided with the requests, the Court finds that there is a
> genuine issue of material fact on the claims of breach of contract.  Specifically,
> there is a factual issue as to whether SWA failed to negotiate the price

adjustments and reimbursements claimed in Counts I through IV and whether WM Mobile provided sufficient documentation from which SWA could find to its reasonable satisfaction that an adjustment or reimbursement was due.

(Id., Doc. 125, p. 14-15).

At trial, the jury found in favor of WM Mobile as to Count III and Count IV and awarded $2,915,766.00 and $558,457.00, respectively. (Id., Doc. 171-1). After post-trial motions, an amended judgment was entered wherein WM Mobile was awarded $1,082,753.00 as to Count III (Id., Doc. 204).

WM Mobile also alleged in the 2013 lawsuit that the Authority breached the 1993 contract by "directing construction and demolition waste, as well as household waste, commercial waste, and yard clippings and trimmings to a separate facility" and depriving WM Mobile of the revenue that would have been generated had this waste been disposed at the Chastang Landfill (Count X). (Id., Doc. 29).  On motion for summary judgment, the Court found that the 1993 contract was not ambiguous and that it required that "all Mobile Solid Waste be disposed of at the [Chastang Landfill] and that Solid Waste is defined in such a manner as to include the type of waste allegedly delivered to Dirt, Inc." (Id., Doc. 125, p. 32).  The Court granted summary judgment in favor of WM Mobile as to the breach of contract, but the issue of damages was reserved for trial. (Id.).  At trial, the jury awarded damages of $3,000,000.00. (Id., Doc., 171-1).  Judgment was entered in accordance with the order on summary judgment and the verdict. (Id., Doc. 173).

The Authority appealed this Court's decision to the Court of Appeals for the Eleventh Circuit, which affirmed the decision.  The issue of "whether the contract requirements for rate changes and reimbursements were satisfied" was raised, *inter alia*, on appeal.  (Id., Doc. 220, p. 3).  The Eleventh Circuit concluded that these arguments and issues lacked merit and were not

addressed.  The Eleventh Circuit addressed only two issues, both of which were raised for the first time on appeal and challenged the Court's diversity jurisdiction.  Ultimately, the Eleventh Circuit determined that diversity jurisdiction existed between the parties.

## II. <u>Statement of the Law</u>

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Williamson v. Brevard County</u>, 928 F.3d 1296, 1304 (11th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). "The movant bears the burden of presenting pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." <u>Id</u>. (citing <u>Procaps S.A. v. Patheon, Inc</u>., 845 F.3d 1072, 1079 (11th Cir. 2016) (citations and quotations omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Id</u>. (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).

The district courts are "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013) (citation omitted).  In reviewing cross-motions for summary judgment, the court should "draw all inferences and review all evidence in the light most favorable to the non-moving party." <u>Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale</u>, 901 F.3d 1235, 1239–40 (11th Cir. 2018) (citation omitted).

### III. <u>Standing</u>

#### A.  <u>Successor-in-interest</u>

The Authority argues that WM Mobile is not the successor-in-interest to the 1993 contract, and therefore, lacks standing to bring this action.  In support, the Authority relies on four arguments. (Doc. 115, p. 8-11). First, the Authority argues that Section 1.10 of the 1993 contract requires the Authority's consent to any assignment, but the Authority never gave consent. (Doc. 115, p. 10).  Second, based upon the deposition testimony of WM Mobile's corporate representatives, the Authority argues that the 1993 contract was never assigned to WM Mobile.  (Doc. 115, p. 9-10; Doc. 128, 5-6). Third, the Authority argues that the Asset Contribution Agreement did not contain an assignment of the 1993 contract, and thus, under Alabama law, the Agreement could not assign the 1993 contract to Chastang Landfill.  (Doc. 115, p. 10-11; Doc. 128, p. 5-6).  Fourth, the Authority questions whether the Asset Contribution Agreement was actually signed before the merger of TWI into WMH, such that TWI would have had the capacity to execute the Agreement and transfer assets.  (Doc. 115, p. 10; Doc. 128, p. 6).

#### 1. <u>Lack of Consent/Collateral Estoppel</u>

The Court looks first to the Authority's argument that without its consent, any assignment is not valid.  The Authority summarily states that:

> Section 1.10 of the Operating Agreement addresses the assignability of the Operating Agreement providing that the SWDA must consent before any assignment is valid. [ ] There is no evidence of notice of an assignment to the SWDA, and certainly no evidence that the SWDA consented as is required by that agreement.

(Doc.  115, p. 10-11).

WM Mobile does not respond specifically to this argument, but generally claims that the Authority is precluded from raising the issue of whether WM Mobile was properly assigned the

1993 contract, i.e., the Operating Agreement: "WM Mobile Bay and the SWDA have already fully litigated this very issue before this very Court. WM Mobile Bay was conclusively found to be a party to the Operating Agreement in the prior lawsuit.  Otherwise, the Court could not have entered a judgment in favor of WM Mobile Bay, and likewise could not have entered a judgment against WM Mobile Bay on the SWDA's counterclaim." (Doc. 134, p. 5-6; citing Civil Action No. 13-0434-KD-N (S.D. Ala. 2013)).[2]

In reply, the Authority argues that collateral estoppel does not apply because the issue of standing was never litigated in the prior case. (Doc. 148, p. 3, 2-6)   The Authority also cites Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331 (1979) and Hicks v. Quaker Oats Company, 662 F2d 1158, 1170 (5th Cir. 1981) and argues that the Court has discretion to determine that offensive collateral estoppel would be unfair to the Authority (and the public). (Doc. 128, p. 14-15).

"The offensive use of collateral estoppel occurs when the plaintiff seeks to preclude the defendant from litigating an issue that the defendant previously litigated in an action **with another party.**  Merced-Torres v. Merck & Co., 393 F. Supp. 2d 1299, 1303 (M.D. Fla. 2005) (citing Parklane Hosiery Co., Inc., 439 U.S. at 326 n. 4, 99 S. Ct. 645) (emphasis added).  WM Mobile is not another party, but rather the same plaintiff from the first case.   Moreover, as explained below, the Court looks to the law of Alabama to determine whether collateral estoppel is appropriate.[3]

---

[2] WM Mobile cites to footnote 2, in the Order on summary judgment in Civil Action No. 13-00434-KD-C, wherein the Court noted that in 2002 TWI transferred its interest in the Chastang Landfill and the 1993 contract to Chastang Landfill, Inc.

[3] Sibille v. Davis, 80 F. Supp. 3d 1270, 1282 (M.D. Ala. 2015) ("Alabama courts adhere to the doctrine of mutuality of estoppel. The doctrine of mutuality of estoppel means that 'collateral estoppel operate[s] only between parties (and their respective privies) who or which have already

In <u>CSX Transportation, Inc. v. General Mills, Inc.</u>, the Court resolved "two lines of divergent precedent" and held "that federal common law borrows the state rule of collateral estoppel to determine the preclusive effect of a federal judgment where the court exercised diversity jurisdiction." 846 F.3d 1333, 1340 (11th Cir. 2017). Therefore, the Court applies Alabama law. Under Alabama law "[c]ollateral estoppel, also termed issue preclusion, is defined as '[a]n affirmative defense barring a party from relitigating an issue determined against that party in an earlier action, even if the second action differs significantly from the first one.'" <u>Bowers v. Wal-Mart Stores, Inc.</u>, 827 So. 2d 63, 67 (Ala. 2001). The application of collateral estoppel is not discretionary; it is an affirmative defense. "Collateral estoppel [] aims to conserve judicial resources by preventing repetitive litigation." <u>Ex parte First Alabama Bank</u>, 883 So. 2d 1236, 1244 (Ala. 2003), <u>as modified on denial of reh'g</u> (Nov. 21, 2003).

"Alabama's doctrine of collateral estoppel requires '(1) an issue identical to the one litigated in the prior suit; (2) that the issue was actually litigated in the prior suit; (3) that resolution of the issue was necessary to the prior judgment; and (4) the same parties.'" <u>Physiotherapy Assocs., Inc. v. ATI Holdings, LLC</u>, No. 2:17-CV-1226-KOB, 2019 WL 4415567, at *4 (N.D. Ala. Sept. 16, 2019) (quoting <u>Stinnett v. Kennedy</u>, 232 So. 3d 202, 219–20 (Ala. 2016) (quoting <u>Dairyland Ins. Co. v. Jackson</u>, 556 So. 2d 723, 726 (Ala. 1990)). Under Alabama law, actual litigation occurs when "the judgment rendered in [the first suit] was not based upon default, stipulation, or consent." <u>AAA Equip. & Rental, Inc. v. Bailey</u>, 384 So. 2d 107, 112 (Ala. 1980); <u>Select Speciality Hosps., Inc. v. Alabama State Health Planning & Dev. Agency</u>, 112 So. 3d 475, 488 (Ala. Civ. App. 2012), <u>as modified on denial of reh'g</u> (Nov. 30,

---

opposed each other in at least one claim that has been litigated to a judgment.") (quoting <u>Stewart v. Brinley</u>, 902 So. 2d 1, 9 (Ala. 2004)).

2012) ("In the first suit that issue was actually litigated, that is, the judgment rendered in it was not based upon default, stipulation, or consent.") (citation omitted).

There is no dispute that the parties are the same. Also, resolution of the issue of whether WM Mobile was a party to the 1993 contract, and thus had standing to sue, was "necessary to the prior judgment". Physiotherapy Assocs., Inc., 2019 WL 4415567, at *4. In a breach of contract action, such as the prior litigation, the existence of a valid contract binding the parties was the first step in the Court's analysis.[4]

Section 1.10 of the 1993 contract provides in pertinent part that "[t]his Contract or any portion thereof may not be assigned by the Contractor without consent of the Authority…." ((Doc. 116-4, p. 7). In the 2013 lawsuit, WM Mobile claimed it was the successor-in-interest to the 1993 contract. (Civil Action No. 13-00434-KD-N, Doc. 29, p. 2, ¶ 7). The Authority denied the assertion and averred that WM Mobile "lacks capacity to sue for the damages claimed in this suit." (Id., Doc. 70, p. 2, ¶ 7). The Authority also raised the affirmative defense that WM Mobile lacked capacity. (Id., p. 9).

The issue being joined, WM Mobile asserted in its motion for summary judgment that it was an undisputed fact that WM Mobile was a party to the 1993 contract, and that it had "operated and managed the Landfill in accordance with the terms of the Contract, continuously and without objection from SWA, since December 17, 2002[,]" the date of the Asset Contribution Agreement between TWI and Chastang Landfill [now WM Mobile]. (Id., Doc. 80, p.7, ¶ 7). WM Mobile also asserted that the Authority had not objected to the earlier mergers

---

[4] Harp Law, LLC v. LexisNexis, 196 So. 3d 1219, 1224 (Ala. Civ. App. 2015) ("In order to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages.") (citing Capmark Bank v. RGR, LLC, 81 So.3d 1258, 1267 (Ala. 2011) (citing Reynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala. 2002)).

and acquisitions affecting the parent companies of TWI, and stated that "[a]lthough there was no formal approval by SWA, both parties proceeded as if there were a valid, binding contract for management of the Landfill." (Id., ¶ 4).

In other words, WM Mobile argued that there was implied consent from the Authority's course of conduct since the 2002 transfer of the 1993 contract to Chastang Landfill, Inc. (Id., Doc. 80, pp 5-7). In response, the Authority did not contest the alleged undisputed fact of consent. (Id., Doc. 96). Instead in the Authority's motion for summary judgment it agreed that "WM Mobile Bay is a successor in interest to Chastang Landfill, Inc., which is an assignee of all rights duties and responsibilities under the 1993 Agreement." (Id., Doc 76, p. 7). In footnote 2, the Authority indicated that while Waste Management failed to get <u>written</u> approval for "various assignments", the Authority was not raising the issue in their motion. (Id., at n. 2)[5]

Thus, because the issue was litigated, is identical to the issue the Authority raises, and WM Mobile's standing was necessary for a judgment to issue, the Authority is precluded from raising the issue in the current lawsuit. <u>Physiotherapy Assocs., Inc.</u>, 2019 WL 4415567, at *4.

Moreover, the Authority represented to the Court, and allowed the prior action to proceed

---

[5] In the section where the Authority argued that WM Mobile breached the 1993 contract by failing to pay royalties to the City of Mobile, the Authority wrote: The Waste Management affiliates who were assigned the contractual rights of TransAmerican completely ignored the contractual obligation to give notice to the Authority and get written permission from the Authority of the assignment. As it turns out, this made no difference monetarily, and hence was not challenged by the Authority, because the Waste Management affiliate continued to pay the royalty on the entire waste stream going to the landfill and did not claim a reduction in royalty by virtue of interpreting the contract to exempt any waste stream being delivered by a Waste Management affiliate or subcontractor. (Ex. 5, Bell Affidavit ¶ 7). Had at the time the prior assignments of the contract been made the then predecessor to WM Mobile Bay given notice of the requested assignment and indicated that it was going to change the royalty calculation to completely exclude most of the waste stream being delivered to Chastang, the assignment would certainly have been challenged and not approved." (Civil Action No. 13-00434-KD-N: Doc. 96, p. 27).

through summary judgment,[6] a jury trial, verdict, and appeal, that WM Mobile Bay was a successor in interest to Chastang Landfill, Inc., and an assignee of all rights duties and responsibilities under the 1993 contract.[7]  The Authority also asserted in a counterclaim that the Authority was owed royalties under the 1993 contract and demanded "judgment against WM Mobile for the amount of the royalty that was underreported and underpaid." (Civil Action No. 13-00434-KD-N: Doc. 9., Amended Counterclaim).  The Authority prevailed on its claim and judgment was awarded in its favor against WM Mobile. (Id., Doc. 173).  The Court relied on the Authority's position that WM Mobile was the party under the 1993 contract responsible for paying the royalties.  The doctrine of judicial estoppel applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Ex parte First Alabama Bank, 883 So. 2d 1236, 1241 (Ala. 2003), as modified on denial of reh'g (Nov. 21, 2003).  As a result, not only is the Authority collaterally estopped from re-litigating this issue, the Authority is also judicially estopped.

## 2.  1993 Contract Assignment to WM Mobile

The Authority next argues that the Asset Contribution Agreement did not appropriately transfer to Chastang Landfill, Inc., now named WM Mobile, the 1993 contract.  As a matter of contract interpretation, the Court first looks to the face of the document to determine whether the

---

[6]  In the order on summary judgment, the Court stated:  The parties do not dispute the existence and formation of the 1993 Contract between SWA and Transamerican, a predecessor to WM Mobile, for the management and operation of the Landfill and Transfer Station. They do not dispute that WM Mobile is the assignee of all rights and responsibilities under the 1993 Contract." (Civil Action No. 13-00434-KD-N, Doc. 125, p. 5).

[7] Again, in the Authority's response to WM Mobile's motion for summary judgment, it stated that "[i]t is undisputed that WM Mobile Bay stands in the shoes of TransAmerican Waste Industries, Inc., the original party to the 1993 agreement whose interests were assigned to a predecessor of WM Mobile Bay without notice or written approval of the Authority as required by the 1993 Agreement." (Civil Action No. 13-00434-KD-N, Doc. 96, p. 22).

1993 Contract was effectively transferred to WM Mobile's predecessor. <u>Brown v. Gadsden</u>

<u>Regional Med. Ctr. LLC</u>, 748 Fed. Appx. 930, 933 (11th Cir. 2018) (citing <u>Fed. Mogul Corp. v.</u>

<u>Universal Constr. Co.</u>, 376 So.2d 716, 723-24 (Ala. Civ. App. 1979) (emphasis omitted)).

("When the language of the contract is plain and unambiguous, we look only to the contract itself

to determine the intent of the contracting parties.").   The document is captioned "Asset

Contribution Agreement and Bill of Sale and Agreement Regarding Assumption of Liabilities"

(Doc. 116-7).  In relevant part, the parties agreed as follows:

> *Section 1. Contribution and Sale by Transamerican*. Transamerican
> hereby grants, sells, transfers, conveys, assigns and delivers to Chastang, its
> successors and assigns, to have and to hold forever, all of Seller's right, title and
> interest in and to those assets and properties listed on Exhibit A hereto
> (collectively, the "Assets"). Such Assets are transferred and conveyed by
> Transamerican to Chastang as a capital contribution. Chastang hereby accepts and
> takes delivery of the Assets and accepts Transamerican's capital contribution in
> connection therewith.

> *Section 2. Assumption of Liabilities by Chastang*. In consideration of the
> Assets acquired by Chastang hereunder, Chastang hereby accepts, assumes and
> agrees to fully perform all of Transamerican's obligations pursuant to and in
> connection with the Assets.

(Doc. 116-7, p. 1).  Exhibit A listed "Chastang Landfill further described as Business Unit 1143"

(Id., p. 3).

TWI sold, transferred, conveyed and assigned to Chastang Landfill, Inc., "all" of its

"right, title and interest" in Chastang Landfill.  TWI's "interest" in the Chastang

Landfill/Business Unit 1143 was based on the 1993 contract to operate and manage the Landfill.

Although the 1993 contract was not specifically assigned, TWI's "right, title and interest" in the

Chastang Landfill was assigned.  The <u>only</u> right or interest that TWI had in the Chastang Landfill

was encompassed in the 1993 contract, so there is no ambiguity as to that specific asset being

assigned.

16

The Authority cites to <u>Clark Substations, LLC v. Ware</u>, 838 So. 2d 360, 365 (Ala. 2002)[8] for its recognition that in a sale-of-assets transaction, Alabama law requires more than the "mere purchase" of assets. (Doc. 115, p. 11; Doc. 128, p. 6).  Instead, Alabama law requires an assignment of specific contract rights for the purchaser to have all the rights of the seller of those assets.  The Authority is correct, however, as set forth *supra*, the Asset Contribution Agreement contains more than the "mere purchase" of assets.  It specifically gave WM Mobile all interest held by TWI in the Chastang Landfill. **Therefore, the Court finds that as a matter of law WM Mobile is the successor to TWI's rights, title and interests in the 1993 contract.**

**3.  <u>Corporate Representative testimony</u>**

As to the third argument, the Authority points to the deposition of the WM Mobile corporate representatives who testified that they were not aware of any assignment of the 1993 contract from TWI to Chastang Landfill, Inc. as evidence that the contract was not assigned. (Doc. 115, p. 9-10).  However, what these representatives know about the assignment does not change the plain language of the Asset Contribution Agreement.

**4.  <u>Timing of merger</u>**

With respect to the fourth argument, the Authority asserts that it is "doubtful" that the Asset Purchase Agreement was signed before 8:40 a.m. on December 17, 2002, the time of the merger between TWI and WMH (Doc. 115, p. 10, n. 3; Doc. 128, p. 6).[9] This speculative argument is not based on any evidence, and therefore, without merit.  Also, the merger documents were corrected to set the effective date as January 3, 2003. (Doc. 116-8; Doc. 152, p.

---

[8] In <u>Clark Substations</u>, the Alabama Supreme Court held that Clark Substations "is not a successor entitled to enforce the noncompetition agreements executed by Ware and Edwards in the course of their employment by Clark Corporation" because the noncompetition agreements were not assignable.  838 So. 2d at 365.

[9] The merger documents indicate 8:30 a.m. (Doc. 115-3).

6).  The Authority has not presented any evidence that the correction was invalid or inoperative to change the effective date.

### B. __Real party in interest__

The Authority argues that Waste Away, WM Mobile's parent company and its sole shareholder, is the real party in interest, and therefore, WM Mobile lacks standing to bring this action and Waste Away's presence destroys diversity jurisdiction.  The Authority bases this argument on the fact that after TWI merged with WMH, WMH conveyed all stock in Chastang Landfill, Inc., now named WM Mobile Bay, to Waste Away. (Doc. 115, p. 11-12).

The Authority also relies heavily on Waste Away's subsequent involvement and representations about the Chastang Landfill to argue that Waste Away is the real party in interest.  Specifically, the Authority points to the deposition testimony of employees of Waste Management to allege that the Chastang Landfill has actually "been operated by employees of a myriad of Waste Management entities other than WM Mobile Bay" (Doc. 115, p. 4).  The Authority also points out that Waste Away represented itself as the successor-in-interest to the 1993 contract in the 2003 Lease between the Authority and Waste Away.  The Authority argues that Waste Away is the only Waste Management entity with a possessory interest in the Chastang Landfill and therefore, WM Mobile's activities at the landfill are by permission of Waste Away or as its agent. (Doc. 115, p. 7; Doc. 128, p. 6-7). The Authority points out that Waste Away executes permits as operator of the Chastang Landfill, and that many of the

invoices upon which WM Mobile relies for damages were addressed to Waste Away's address in Theodore, Alabama. [10] (Doc. 115, p. 12).

WM Mobile responds that Waste Away is not involved in the <u>operation</u> of the Landfill and therefore, is not the real party in interest (Doc. 134, p. 9-10; Doc. 152, p. 7).  Moreover, WM Mobile argues that the statement in the preamble recitals in the 2003 lease with respect to Waste Away's succession to the 1993 contract, cannot negate the legal effect of the corporate transactions regarding the 1993 contract. (Doc. 134, p. 9-10). WM Mobile points out that all employees who work at the Chastang Landfill are WM Mobile employees and that the employee depositions cited by the Authority are depositions of Waste Management employees who provide professional services to the Chastang Landfill as well as other Waste Management facilities. WM Mobile also argues that the Authority did not identify any employee of Waste Away with responsibilities for the Chastang Landfill. WM Mobile also points out that the Authority did not identify any assets of Waste Away that were used in the operation of the Chastang Landfill. (Id.).

---

[10] The Authority provided copies of eleven invoices billed to "W/M Chastang", "Waste Management – Chastang Landfill", "Waste Management Chastang LF", "Waste Management", "Waste Management, Inc. Chastang Landfill", shipped to the Chastang Landfill, and addressed to accounts payable at a Theodore address.  But no mention of Waste Away as the recipient or payee of the invoices.  (Doc. 129-6)

In its response to WM Mobile's motion for summary judgment, the Authority stated that WM Mobile Bay does not issue monthly waste bills to the City and that payments were not made to WM Mobile Bay. In support, the Authority provided copies of two invoices sent to the City of Mobile.  One invoice for January 2019 was from "Waste Management of AL – Mobile" with a mailing address of Phoenix, Arizona. Payments were to be sent to Louisville, Kentucky. (Doc. 129-6).  WM Mobile explains that this invoice is for the Waste Away Transfer Station, not the Landfill.  (Doc. 152, p. 7).  Also, the other invoice for June 2019, was from WM Mobile Bay Environmental Center, Inc. for the Chastang Landfill.  The Payment Coupon indicated that payment should be mailed to Waste Management in Atlanta, Georgia. (Doc. 129-6, p. 48).

Rule 17(a)(3) of the Federal Rules of Civil Procedure provides for "Joinder of the Real Party in Interest" and sets forth as follows:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed. R. Civ. P. 17(a)(3).  The Rule allows the real party in interest a period of time to participate before the action may be dismissed for failure to prosecute in the name of the real party in interest.

Waste Away has not ratified, joined or been substituted into this action.  Thus, the Authority wants the Court to determine whether the real party in interest is Waste Away, and if so, involuntarily join Waste Away into this action as a Plaintiff, and then dismiss the action for lack of diversity jurisdiction because Waste Away is an Alabama corporation.

Rule 17 of the Federal Rules of Civil Procedure also requires that an "action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1).  Rule 17(a)(1) "protects the defendant against a subsequent action by the real party in interest and ensures that judgments have res judicata effect." Symonette v. V.A. Leasing Corp., 648 F. App'x 787, 789–90 (11th Cir. 2016) (citation omitted).  "A real party in interest is 'the party who, by the substantive law, has the right sought to be enforced.'" Id. "The phrase, 'real party in interest,' is a term of art utilized in federal law to refer to an actor with a substantive right whose interests may be represented in litigation by another." Muzuco v. Re$ubmitIt, LLC, 297 F.R.D. 504, 513 (S.D. FLA. 2013) (citing U.S. ex. rel. Eisenstein v. City of New York, N.Y., 556 U.S. 928, 934–35, 129 S. Ct. 2230, 173 L.Ed.2d 1255 (2009)). "Courts look to governing substantive law to identify the true owner of the legal interest at issue." Id. (citing ECI Mgm't Corp. v. Scottsdale

Ins. Co., 23 F.3d 354, 356 (11th Cir.1994); Arabian Am. Oil Co. v. Scarfone, 713 F. Supp. 1420, 1422 (M.D.Fla.1989)).

Under Alabama law, a party to the contract may sue for the breach. Whoever is the successor-in-interest to the 1993 contract, would be a party. As previously stated, WM Mobile is the successor-in-interest to the 1993 contract. The fact that Waste Away is the parent company and holds all the stock of WM Mobile does not change the fact that WM Mobile is the party to the 1993 contract.  WM Mobile is the real party in interest who has the right to sue to enforce the 1993 contract.[11]

## IV.   Count I - Breach of Contract relating to reimbursements for expenses due to changes in laws and regulations

WM Mobile claims that the "Authority has a contractual obligation to reimburse WM Mobile for capital expenses and operational costs for the Chastang Landfill's gas management system, MAWSS surcharges for leachate pre-treatment, and leachate analytical costs." (Doc. 61, p. 7, Amended Complaint).  Relying upon Section 6.6 of the 1993 contract, WM Mobile alleges that the Authority has failed to reimburse WM Mobile for these expenses and costs in 2016, 2017, 2018, which were incurred due to changes in laws and regulations. (Id.) WM Mobile seeks damages in the amount of $807,768.58. (Id.).

The Authority argues that the methodology for determining tipping fees is vague and thus Section 6.6 is void and unenforceable.   Specifically, the Authority alleges that Section 6.6 "does not provide a defined manner for the rate changes to be determined." (Doc. 115, p. 20).  The Authority also argues that Section 6.6 is void for uncertainty because it is an agreement to agree

---

[11] WM Mobile's motion to strike (Doc. 163) documents related to this issue is **MOOT**.

in the future.  The Court finds these arguments to be without merit as it relates to the issues

before the Court.  WM Mobile relies on the following for its claim of reimbursement for

operation costs of the gas management system, MAWSS surcharges and leachate analytical

costs: "[T]he Authority shall reimburse contractor for any increases in Contractor's costs due to

laws, rules, regulations or ordinances that become effective or have different interpretation after

the date this Contract is entered into and that have an adverse impact on Contractor hereunder."

(Doc. 134, p. 11-12)    This provision does not implicate a rate change that relies on an undefined

methodology nor is it based on an agreement to agree.   The amount to be reimbursed is not

vague nor subject to negotiation.

     WM Mobile also argues that the Authority is collaterally estopped from relitigating the

issue of whether the claimed expenses are reimbursable under the 1993 contract because the

issue was decided in the prior litigation. (Doc. 134, p. 17-18). WM Mobile alleges that this Court

previously held that these capital expenses and operational costs were reimbursable under

Section 6.6, and that it was awarded damages for the Authority's prior breaches of this contract

provision, thus, the Authority is collaterally estopped from arguing otherwise. (Id., p. 3).

     The Authority asserts that the collateral estoppel is inapplicable because the "expenses

are different, the work is different, the basis for the expenses are different, and the regulatory

requirements, if any, are different depending upon the basis for each expense" (Doc. 148, p. 3).

The Authority argues that the Landfill gas expenses and the MAWSS leachate surcharges are not

the result of a change in law after 1993 and that the analytical costs are not reimbursable

pursuant to Section 2.3. "Landfill Monitoring" (Id., p. 10-11).

     As previously stated "Alabama's doctrine of collateral estoppel requires '(1) an issue

identical to the one litigated in the prior suit; (2) that the issue was actually litigated in the prior

22

suit; (3) that resolution of the issue was necessary to the prior judgment; and (4) the same

parties.'" Physiotherapy Assocs., Inc., 2019 WL 4415567, at *4.

**The Court finds that the Authority is collaterally estopped from re-litigating whether operational costs for the Chastang Landfill's gas management system, MAWSS surcharges for leachate pre-treatment, and leachate analytical costs are reimbursable under Section 6.6 of the 1993 contract.**   This is because these identical issues were previously litigated between the same parties and the resolution was necessary to the prior judgement. Specifically, the jury determined that the increased costs of operating the landfill due to changes in law and regulations after 1993 was $558,457.00. (Civil Action No. 13-00343, Doc. 171-1 at 2).  This amount was made up of MAWSS surcharges for leachate pre-treatment of $63,858, leachate analytical costs of $101,120[12], and operational costs of the gas management $393,479. (Id., Doc. 182, p. 197-204).

**However, the Court finds that there are issues of fact as to what costs have been incurred and not reimbursed for operation of Chastang Landfill's gas management system, MAWSS surcharges for leachate pre-treatment, and leachate analytics.**[13]  Accordingly, summary judgment is **DENIED** in part as to Count I.

## V.  Count II- Breach of Contract relating to exclusive disposal rights

---

[12] The slight discrepancy between the amount awarded ($63,858 and $101,120) and the testimony ($63,850 and $101,152) appears to be the result of the amount requested by counsel in closing argument.  (See, Civil Action No.13-00434, Doc. 185, p. 91).

[13]   The Authority's motions to strike Rob Iversen's and Mark Noel's affidavits (Docs. 131 and 132) are **DENIED** for reasons stated in WM Mobile's responses (Docs. 160 and 161).  The Authority's motion to strike Dale Seekely's affidavit (Doc. 133) is **MOOT**.  The Court did not rely on the affidavit in finding there are issues of fact that remain.  The Authority's Daubert motion (Doc. 137) is **carried to trial**.

WM Mobile claims that the Authority "has breached the Contract by failing to send all construction and demolition waste as well as certain household waste, commercial waste, and yard clippings and trimmings to the Chastang Landfill or Transfer Station, thereby depriving WM Mobile Bay of the profits that would be generated by the disposal of such waste at the Chastang Landfill." (Doc. 61, p. 8). WM Mobile seeks a judgment against the Authority for lost profit, plus interest and cost. (Id.).

The Authority responds that the 1993 contract was not breached because yard waste was never intended to be a part of the City of Mobile Solid Waste Steam as defined in the 1993 contract. (Doc. 115, p. 24-26; Doc. 128, p. 10). In support, the Authority asserts that for twenty years, WM Mobile and its predecessors never objected to disposal of yard waste and construction and demolition waste at Dirt, Inc. The Authority points to the fact that TWI – WM Mobile's predecessor – bid for disposal of the City's construction and demolition and yard waste in 1995, and thus, it did not consider this waste as subject to the 1993 contract. The Authority also argues that WM Mobile's lost profits calculation is based upon unsubstantiated assumptions by its expert witnesses as to the volume of alleged diverted wastes. (Doc. 115, p. 26; Doc. 128, p. 9-10).

WM Mobile correctly argues that the Court determined in 2013 that the diversion of construction and demolition waste and yard waste was a breach of contract as a matter of law because the contract unambiguously defines solid waste to include demolition and yard waste. (Civil Action No. 13-00434-KD-N, Doc. 125, p. 29-32). WM Mobile also correctly asserts that the Court previously determined that the Authority was obligated to deliver all of the Mobile Solid Waste Stream to the Chastang Landfill. (Id., p. 32). The Authority is collaterally estopped from arguing otherwise. Moreover, even if not collaterally estopped, the Court's determinations are the same. The 1993 contract is not ambiguous: All Mobile Solid Waste is to be delivered to

Chastang Landfill. And "Mobile Solid Waste" is defined in the 1993 contract as "[a]ll non-infectious industrial, commercial, residential or municipal or other Solid Waste that is generated within the Service Area" excluding hazardous waste or waste that could not by law be deposited. (Doc. 116-4, p. 3). "Solid Waste" is defined as "[a]ll Refuse and Demolition Waste." (Id., p. 2, 4). And "Refuse" is defined to include "cuttings from trees, lawns, and gardens" (Id., p. 4). And because the contract is not ambiguous, the Authority cannot present evidence that the parties did not intend what was stated.[14]

The Authority does not dispute that construction and demolition waste and yard waste have been diverted. Accordingly, summary judgment on the issue of breach of contract is GRANTED in favor of WM Mobile. **However, the Court finds that there are issues of fact regarding damages as it relates to this breach.** Accordingly, summary judgment is DENIED in part as to Count II.[15]

## VI. Conclusion

Upon consideration, and for the reasons set forth herein, the Court finds as follows:

Summary judgment is DENIED in part and GRANTED in part as explained above.

DONE and ORDERED this 11th day of March 2020.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
CHIEF UNITED STATES DISTRICT JUDGE

---

[14] WM Mobile's motion to strike (Doc. 150) documents related to this issue is **MOOT**.

[15] The Authority's motion to strike the affidavit of Ronnie Griffing (Doc. 130) is **DENIED**. Griffing was not specially employed to provide expert testimony. Moreover, Griffing's testimony regarding the calculation of lost profits is not expert testimony. However, WM Mobile will be required to prove the factual basis (i.e. the amount of waste diverted) prior to Griffing being allowed to use this fact in his testimony regarding lost profits.